UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Crystal Green, | ) |
|     Plaintiff, | ) |
| v. | ) No. 14 CV 50090 |
| | ) Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting | ) |
| Commissioner of Social Security, | ) |
|     Defendant. | ) |

## **MEMORANDUM OPINION AND ORDER**

Crystal Green brings this action under 42 U.S.C. §405(g), appealing the denial of social security disability benefits. As explained below, the case is remanded for further analysis.

## **BACKGROUND**

Plaintiff started abusing alcohol when she was 10 or 11 and has continued off and on again through her adult life. At age 16, she started smoking crack and used it periodically thereafter. R. 821. Occasionally, she has been able to stop using these substances. R. 58. In later talks with therapists, she attributed these problems to childhood sexual abuse by a family member. She also claims to suffer from mental health problems, including anxiety, depression, and excessive anger.

Despite these problems, she was able to work for certain periods, a fact the administrative law judge ("ALJ") found significant. From 1999 until January 11, 2008, she worked on an assembly line at Chrysler. She was fired twice—first in 2006, then after being rehired in 2007, again permanently in January 2008. R. 20, 783. Drinking was one reason cited for the termination, although anger issues may also have been a cause. Plaintiff also periodically has had legal problems, although the record is murky about these problems.

1

The record contains little information about her medical history before 2008. Her arguments for remand focus on what she describes as four discrete inpatient stays at an alcohol treatment facility from roughly November 2008 through August 2009.[1] Accordingly, this opinion will focus on these four stays.[2] Additionally, plaintiff also periodically received outpatient treatment, and has also complained about physical problems, although the latter do not figure in the arguments here.

The first stay was at a facility plaintiff refers to as New Leaf. Dkt. # 10 at 8-9. Plaintiff stayed there over three months, from November 10, 2008 through February 24, 2009. She was diagnosed with alcohol dependence and also reported symptoms of depression. During the stay, Dr. Brent Snell treated plaintiff and prescribed various psychiatric medications. She also participated in group therapy sessions.[3] The second stay, again based on plaintiff's brief, was from February 26, 2009 through May 11, 2009. The parties do not provide many details about this stay. It appears that plaintiff lived under the same general set-up. Plaintiff's third stay was from June 16, 2009 through July 20, 2009. The fourth stay was for an unspecified time in August 2009. During her stays, plaintiff was given drug tests and tested positive on a few occasions, but on others was found to be free from drugs. R. 570.

On May 25, 2010, plaintiff was evaluated by consulting psychologist Kelly Renzi. She diagnosed plaintiff with anxiety and depressive disorders, and with alcohol and cocaine dependence in early full remission. R. 785.

---

[1] As the Court understands plaintiff's use of the term "inpatient," it means that she lived at the facility.
[2] In describing the four stays, the Court is relying on plaintiff's description of them in her opening brief, even though this description is confusing in places about the precise dates. The Government has not disputed plaintiff's central contention that there were four discrete and lengthy stays. Consequently, the Court relies on the brief's representations.
[3] There are over 200 pages of records about these stays. Exhibit 8F.

In 2010 and 2011, Phyllis Brister, an agency psychologist, reviewed plaintiff's medical history and completed three check-box forms. Exs. 11F, 22F, 23F. Most relevant to this appeal, she found that plaintiff had no episodes of decompensation, although she did not (as far as this Court can tell) provide any explanation for why she reached this particular conclusion.

A hearing was held on October 12, 2012. Then 41 years old, plaintiff testified about her work history and some of her medical treatment. She explained generally that she has had "very bad anxiety and anxiety attacks and depression, and [that she has] had that for years and it's just getting worse." R. 45.

On December 19, 2012, the ALJ found plaintiff not disabled. He found that she had the following severe impairments relevant to this appeal: alcohol dependence, polysubstance abuse, mood disorder, and anxiety. The ALJ next considered several Section 12 mental health listings. The ALJ found that plaintiff had mild limitations in daily activities, but moderate limitations in social interaction and concentration. Critically to this appeal, the ALJ found no episodes of decompensation. He provided only a brief and conclusory explanation for these findings. The longest and most freewheeling part of the opinion is the residual functional capacity ("RFC") analysis. R. 18-25. There, the ALJ provided a chronological summary of plaintiff's medical visits interspersed with occasional analysis. Two themes emerged. One is the ALJ's conclusion that plaintiff only received intermittent treatment for her problems. The other theme is his conclusion that plaintiff worked for many years despite having the same problems she now claims prevent her from working. The ALJ concluded that plaintiff had the RFC to do light work limited to "simple routine repetitive tasks, subject to only occasional social interaction and no public contact." R. 18.

3

**DISCUSSION**

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

Plaintiff's main argument is her assertion that the ALJ ignored, or significantly downplayed, the four stays. This argument can be broken down into two parts. The first is the basic factual question of whether the ALJ was aware of these stays and, if so, whether he knew about their length and the scope and nature of the treatments. If he did not, then his opinion rests on a flawed factual picture and the inquiry into how he applied those facts to the legal tests would be meaningless.

The Government argues that the ALJ "expressly acknowledged" these stays. Dkt. #11 at 5. However, this assertion is accompanied by several hedges. The Government states that the ALJ expressly acknowledged only that plaintiff received inpatient treatment "on more than one occasion" and that "on at least one of those occasions spent some months at the treatment facility." *Id.* The phrase "on more than one occasion" is equivocal on whether the ALJ was aware that there were four separate stays. Similarly, the assertion that "at least one" of the stays was for "some" months begs the question whether the ALJ understood how long each stay was.

4

In reading the page of the ALJ's opinion cited by the Government to support these assertions (R. 19), the Court can find only a few fleeting references to the stays. The clearest is this sentence: "The claimant completed an April 1, 2010 function report indicating that she lived in a women's treatment center." R. 19. Although the ALJ at least acknowledged that plaintiff was once in a center on one day (April 1st), the ALJ never indicated that there were four stays, one for over three months and another for almost three months. These were not brief stays. Given the voluminous medical records, the ALJ should have been aware of them. Still, these cursory and vague references raise questions about just what he knew and considered. At the hearing, there was no real discussion about these stays either. At a minimum, the ALJ strongly downplayed them, such that an uninformed reader would not realize plaintiff spent a good portion of a year living in an inpatient facility.

The second part of plaintiff's argument focuses on the legal tests. Her main claim is that the ALJ failed to explain why these stays did not qualify as "repeated episodes of decompensation, each of extended duration," a requirement in several of the Section 12 mental health listings. Recently, this Court considered the meaning of this phrase. *See Koelling v. Colvin*, 2015 WL 6122992 (N.D. Ill. Oct. 16, 2015). As the Court noted there, this phrase has not been analyzed extensively in the case law. The introductory portion to Section 12 provides the following helpful overview:

> *Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g. hospitalizations, placement in a

halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.

As suggested by this explanation, the phrase contains three parts: definition, duration, and frequency. The first paragraph offers a general definition along with examples of how a claimant could satisfy it. Such an episode generally involves a significant increase in symptoms requiring "increased treatment" or the need for a "less stressful situation." One example is a "significant alteration in medication." Others include being hospitalized or placed in a halfway house or highly structured household. The next paragraph discusses the duration and frequency requirements, setting forth bright-line tests. Each episode must last "at least 2 weeks," and there must at least three in a one-year period. The paragraph also offers an alternative test if the episodes are shorter or less frequent. This is an equivalency analysis, directing the ALJ to assess whether the episodes are "of equal severity."[4]

Aside from this explanation, the best other guidance is the Seventh Circuit's 2010 decision in *Larson v. Astrue*, 615 F.3d 744 (7th Cir. 2010), a case involving similar facts. Like plaintiff here, Lynn Marie Larson suffered from anxiety and depression as well as drug and alcohol abuse. *Id.* at 745. There were two discrete instances arguably qualifying as an episode of decompensation. In the first, referred to as a "nervous breakdown," she missed two weeks from

---

[4] Critically, the regulation requires the ALJ to use "judgment" in conducting the analysis. Obviously, an ALJ cannot use judgment if (1) the ALJ does not know the facts or (2) if the ALJ ignores the equivalency analysis entirely.

6

her job as a part-time bus driver. *Id.* at 747. Apparently, she was not hospitalized. She then "self-medicated" with alcohol and marijuana. The second episode occurred in January 2006. At that time, her psychotherapist worried that Ms. Larson was having suicidal thoughts and contacted police, who took her to the hospital. In addition, Ms. Larson's treating psychiatrist, Dr. Rhoades, checked a box on a form stating that Ms. Larson "was experiencing repeated (*i.e.*, three or more) episodes of decompensation." *Id.* at 747. The medical expert at the administrative hearing, Dr. Carter, testified that plaintiff had no episodes of decompensation.

The Seventh Circuit reversed, finding that the ALJ and Dr. Carter wrongly applied the decompensation requirement. The Seventh Circuit concluded that, among other things, Dr. Carter failed to "comment on" the two-week nervous breakdown and failed to consider that Ms. Larson had "frequent adjustments to her medications." *Id.* at 748. The Seventh Circuit faulted both the ALJ and Dr. Carter for taking a "too narrow" view of the decompensation requirement. The Seventh Circuit explained that being hospitalized was not the only way to meet the test and that "many other scenarios" qualify. *Id.* at 750. One is a "significant alteration in medication." *Id.* The Seventh Circuit also faulted the ALJ for not considering the alternative, catch-all test under which shorter but more frequent episodes could be sufficient.

Based on the above authority, the Court finds that this case should be remanded. The ALJ provided the following analysis:

> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. The claimant has had no psychiatric hospitalizations or treatment with a psychiatrist.

R. 17. This two-sentence explanation is insufficient. First, it is boilerplate with no discussion of the particular facts of this case. Most notably, the ALJ did not acknowledge in this portion of the opinion, where one would logically expect it to be discussed, that plaintiff had four inpatient

7

stays. At a minimum, the ALJ should have explicitly analyzed them under the decompensation criteria—*i.e.* definition, duration, and frequency. The fact that the ALJ, later in the RFC analysis, made a few fleeting references to them is not a substitute for this analysis. This not a case where, as sometimes happens in disability cases, the plaintiff has no credible basis for claiming she had an episode of decompensation, in which case a conclusory explanation *might* be acceptable. Here, in contrast, the documented lengthy stays deserve an explanation, again raising a question of whether the ALJ simply overlooked them.

Second, the brief explanation provided by the ALJ—that plaintiff had no psychiatric hospitalizations or treatment with a psychiatrist—rests on a misunderstanding of the legal requirements. As noted above, there is no hospitalization requirement, and a stay a halfway house is specifically mentioned as an alternative way to meet the standard. Although the plaintiff has not used the terminology of a halfway house, her stay at an inpatient alcohol facility would seem to be equivalent. If the Seventh Circuit found it to be an error for the ALJ not to consider a two week nervous breakdown, where the claimant merely missed work but apparently was not hospitalized nor placed in a halfway house or inpatient facility, then it follows that it also an error not to comment on multiple month-long stays at a rehabilitation facility.[5]

The Government argues that these four stays do not qualify as episodes of decompensation. It asserts that a "hospitalization <u>may</u> indicate that a claimant has experienced an episode of decompensation, but it does not mean that every person receiving inpatient substance abuse treatment is decompensating." Dkt. #11 at 6 (emphasis in original). It also notes that

---

[5] Nor is there, insofar as this Court is aware, any requirement that plaintiff be treated by a psychiatrist to qualify as having an episode of decompensation. In any event, the Court has doubts about the accuracy of the ALJ's claim that plaintiff was never seen by a psychiatrist. While in the inpatient facility, she was seen numerous times by Dr. Snell who prescribed psychiatric medications. *See, e.g.*, R. 656 (prescribing Klonopin and Trazadone); R. 716 (discontinuing Lexapro, starting Celexa, and increasing her dose of Trazodone); *see also* 766-767, 764-65, 617-618, 615-616, 613-614, 611-612. These references suggest that Dr. Snell was a psychiatrist; however, the Court has found no precise confirmation of this point.

plaintiff "voluntarily" initiated the first inpatient treatment stay. The Government seems to be suggesting that plaintiff was not really experiencing serious problems and was frivolously seeking unnecessary treatment. The Government's argument is not developed, as it has pointed to little concrete evidence to support these vague claims. Presumably, based on cost alone, plaintiff would not have been allowed to stay for so long if there were no need for treatment. This point aside, these speculations cannot be considered now because the ALJ never relied on this rationale. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("the *Chenery* doctrine [] forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced").

One additional point relating to the decompensation issue. Plaintiff has focused on the four inpatient stays, but as *Larson* makes clear, many other types of episodes may qualify (for example, Ms. Larson's two-week nervous breakdown), and the ALJ must consider whether shorter episodes less than two weeks may still qualify under an equivalency analysis. In this regard, plaintiff has alleged that she suffered from other episodes in addition to the four stays. In fact, in his summary of the facts, the ALJ identified this fact: "[In July 2012, plaintiff] noted [to a Rosecrance counselor] increased anxiety over leaving her house, and that she would feel depressed for about 4-5 days, her last episode being that past weekend." R. 23. Interestingly, the ALJ himself used the word "episode" to describe these events. Although simply using this word does not mean that this event would meet all the decompensation requirements, it at least signals the need to consider the equivalency analysis discussed in *Larson*.

In sum, based on *Larson* and other Seventh Circuit cases, the Court finds that the ALJ's failure to conduct an analysis of the decompensation requirement justifies a remand. *See also Phillips v. Astrue*, 413 Fed. Appx. 878, 886 (7th Cir. 2010) ("Because the ALJ did not explain

why none of Phillips's suicide attempts, hospitalizations, or frequent medication adjustments evidenced episodes of decompensation, he failed to build a logical bridge between the evidence and his finding that she could perform full-time work.").

The ALJ's failure also potentially affected the RFC analysis in several ways. The ALJ repeatedly faulted plaintiff for only receiving intermittent treatment. The ALJ concluded that she "has not undergone any sustained treatment." [6] R. 22. Although the ALJ could and should consider whether there were treatment gaps, at the same time, the ALJ should make this assessment in light of the overall context—more specifically, that plaintiff spent a great part of a year at a facility where, among other things, she participated in twice-daily group therapy sessions. Furthermore, the ALJ never acknowledged that plaintiff testified that she had difficulty paying for treatment. R. 47; *see Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin").

There is another way the ALJ's overlooking of the stays contributed to a misleading picture. Several times, the ALJ several times noted that plaintiff's daily activities showed that she was capable of working. In the RFC analysis, the ALJ relied on a report, dated April 1, 2010, in which plaintiff described her daily activities. R. 19-20; Ex. 4E. But the ALJ failed to take into consideration that plaintiff was then staying at a facility. Among other things, plaintiff reported that someone at the facility reminded her when to take medications (R. 211); that staff prepared meals for her and the residents (R. 211); that she attended group therapy sessions (R. 213); that she had a built-in group of other women friends to talk to (R. 209). As for as interacting with the public, plaintiff stated that she "like[s] to have one person I can trust to go with [her] in public."

---

[6] *See also* R. 19 (plaintiff "attended therapy only intermittently"); R. 21 (plaintiff "intermittently was obtaining prescription medications from a physician's assistant, and intermittently attending family counseling services").

R. 212. The ALJ should have considered that living in this highly structured setting makes it substantially easier to manage daily activities. *See* POMS DI 22511.05 ("Highly structured and supportive settings may greatly reduce the mental demands placed on an individual. With lowered mental demands, overt signs and symptoms of the underlying mental disorder may be minimized. At the same time, however, the individual's ability to function outside of such a structured and/or supportive setting may not have changed. An evaluation of individuals whose symptomatology is controlled or attenuated by psychosocial factors *must consider* the ability of the individual to function outside of such highly structured settings.") (emphasis added).[7]

The stays were also potentially relevant to the ALJ's other main theme—namely, the belief that plaintiff had worked for years despite having these same problems. The ALJ failed to consider plaintiff's testimony that, although she had these general problems for years, they had become much worse in the last few years. The multiple lengthy inpatient stays beginning in 2008 arguably support this theory of worsening symptoms, as do the two firings at Chrysler late in her tenure there.

Having found that plaintiff's main argument justifies a remand, the Court will only briefly comment on a few remaining arguments. Plaintiff has argued that the ALJ made other, albeit smaller, factual errors or strained inferences. The Court agrees. In her opening brief, plaintiff explained that the ALJ wrongly believed plaintiff had been driving "several hundred miles round-trip" to see her ill father in Peoria. The ALJ mentioned this fact twice in the opinion, finding that it both undermined plaintiff's claim that she had concentration problems and showed she had mobility and adaptability. R. 18, 21. However, as the Government now agrees, the ALJ was mistaken on this point. Plaintiff did not make these long drives. Dkt. # 11 at 10.

---

[7] This POMS section was cited by the Government in its brief to make a separate point. As the Government explained, POMS stands for *Program and Operations Manual System.* It is an internal handbook for SSA employers, a source the Supreme Court has held may be looked to for guidance. Dkt.#11 at 5.

Plaintiff also complains about the ALJ's finding, made at the end of the listing analysis, that she was unable to "provide accurate and specific detail" because she told two consulting psychologists that she "never had undergone psychiatric hospitalization" but then later—in a supposed contradiction—told a Rosecrance therapist that she had "been an inpatient" at a substance abuse facility. R. 18. This argument is problematic on several levels. As a preliminary point, the larger inference to be drawn is not entirely clear. One possible interpretation is that plaintiff's inability to provide accurate details supports her claim that she had concentration problems. The more likely interpretation, however, is that the ALJ believed plaintiff was lying in some way. But this interpretation just leads to more questions. For example, which of the two statements did the ALJ believe was wrong? Additionally, did the ALJ think plaintiff was lying when she stated that she had never been psychiatrically hospitalized? This seems unlikely because the ALJ himself repeatedly mentioned the lack of hospitalizations as a reason for not finding plaintiff disabled. Plus, it would be odd if plaintiff hid a fact helpful to her claim. So, this would suggest the ALJ believed plaintiff was lying when she stated that she had been an inpatient. Perhaps the ALJ thought inpatient only could refer to a hospital stay. But there was much evidence in the record about plaintiff being an inpatient at a rehabilitation facility. In short, the Court does not see how plaintiff's statements are contradictory. They are apples and auto parts. Both *Larson* and Section 12 refer to hospitalization and halfway houses as distinct types of treatment. The ALJ's apparent conflation of the two again raises doubt about his understanding of the record.

One final issue should be noted. Although not addressed by the ALJ, one issue looms over the entire case. The Social Security Act provides that disability insurance benefits may not be awarded to any person whose alcoholism or drug addiction is a material factor contributing to

the finding of disability. 42 U.S.C. § 423(d)(2)(c); *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006) ("When an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the administrative law judge is whether, were the applicant not a substance abuser, she would still be disabled."). The parties agree that the ALJ never made any explicit finding on this question. Instead, as the Government explains, the ALJ essentially gave plaintiff the benefit of the doubt on whether her alcoholism, rather than her mental illnesses, caused her health problems, even though her addiction problems have been at the forefront all along. So it is somewhat surprising that it is plaintiff who complains about the failure to address this issue. Plaintiff notes that she tested negative for drugs and alcohol on some occasions. Dkt. # 10 at 13. Although not fully explained, plaintiff may be concerned that the ALJ's many references in the opinion to her ongoing addiction problems showed that the ALJ, without stating so explicitly, was implicitly making a materiality finding. At this point, plaintiff's argument is undeveloped. However, on remand, the ALJ should confront this issue more directly to avoid any confusion.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted; the government's motion is denied; and the decision of the ALJ is remanded for further consideration.

Date: January 12, 2016          By: _____
                                    Iain D. Johnston
                                    United States Magistrate Judge